# UNITED STATES DISTRICT COURT
### for the

In the Matter of the Search of                )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)*  )          Case No. 1:23MJ265-1
THE BLACK DODGE RAM WITH NORTH CAROLINA       )
TAG NUMBER PAF8003                            )
                                              )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3.

located in the _____ Middle _____ District of _____ North Carolina _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 245(b)(2)(B) | Interference with Federally Protected Activities |
| 42 U.S.C. 3631(a) | Criminal Interference with Right to Fair Housing |

The application is based on these facts:

See affidavit of Special Agent Michael Stone

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Michael Stone
*Applicant's signature*

_____
FBI Special Agent Michael Stone
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 6/20/2023  3:28 pm            _____
                                    *Judge's signature*

City and state: Durham, North Carolina      Joe L. Webster, United States Magistrate Judge
                                            *Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT NORTH CAROLINA

IN THE MATTER OF THE SEARCH OF:

THE PREMISES AT
1765 RED BIRD CIRCLE,
CONCORD, NORTH CAROLINA 28025;

Case No. 1:23MJ265-1

THE PERSON OF MARIAN HUDAK;

THE BLACK DODGE RAM TRUCK; AND

THE GRAY HONDA CIVIC LX

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Stone, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the FBI. I have been so employed since August 2020. I currently investigate federal crimes involving civil rights violations and public corruption for the Charlotte Division of the FBI. Prior to my employment as a Special Agent, I served in a sworn law enforcement capacity at the local and state levels since 2015. I have been trained by the FBI in numerous investigative techniques, as well as in the preparation, presentation, and service of criminal complaints, arrest warrants, and search warrants, and I have been involved in the investigation of numerous types of offenses against the United States.

2.      In October 2022, FBI Charlotte began an investigation into potential violations of 18 U.S.C § 245 (Federally Protected Activities) and 42 U.S.C § 3631 (Criminal Interference with Right to Fair Housing) committed by Marian Hudak (Hudak).

3.     Title 18 U.S.C § 245(b)(2)(B) makes it a crime for someone to, "by force or threat of force . . . intimidate[] or interfere[] with, or attempt[] to . . . intimidate or interfere with any person because of his race, color, religion, or national origin and because he is or has been . . . participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."

4.     Title 42 U.S.C. § 3631(a) makes it a crime for someone to willfully, "by force or threat of force injure[], intimidate[] or interfere[] with, or attempts to injure, intimidate or interfere with any person because of his race, color, religion, sex, handicap [], familial status [], or national origin and because he is . . . occupying" a dwelling.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that Hudak violated Title 18 U.S.C § 245(b)(2)(B) and Title 42 U.S.C. § 3631(a).  This affidavit is made in support of an application for a warrant to search the premises located at 1765 Red Bird Circle, Concord, North Carolina 28025 (the "SUBJECT PREMISES"), more particularly described in Attachment A-1; the person of Marian Hudak (the "PERSON TO BE SEARCHED"), more particularly described in Attachment A-2; Hudak's black Dodge Ram Truck with North Carolina tag number PAF8003 (the "SUBJECT VEHICLE 1"), more particularly described in Attachment A-3; Hudak's gray Honda Civic LX with North Carolina tag number HET5079 (the "SUBJECT VEHICLE 2") (and collectively with SUBJECT VEHICLE 1, the "SUBJECT VEHICLES"), more particularly described in Attachment A-4.

6.     There is probable cause to believe that evidence of violations of Title 18, United States Code Section 245(b)(2)(B) (Federally Protected Activities) and Title 42, United States Code, Section 3631 (Criminal Interference with Right to Fair Housing), which are more specifically described in Attachment B of this Affidavit, will be found on the SUBJECT

2

PREMISES and/or on the PERSON TO BE SEARCHED and/or the SUBJECT VEHICLES. The facts and information in this affidavit are based upon my personal knowledge as well as the observations of other law enforcement agents and others involved in the investigation.

7.     The facts in this Affidavit come from my personal observations and involvement in this investigation, my training and experience, and information obtained from other special agents, and witnesses, including other law enforcement witnesses. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a search warrant, it does not contain every fact known to me or other agents of the FBI.

## PROBABLE CAUSE

Subject Vehicle 1 Incident

8.     On October 18, 2022, A.R. reported to the FBI that she and her boyfriend, J.S., were victims of a hate crime perpetrated by Hudak, a white man. In subsequent interviews, A.R. and J.S. reported that, on October 13, 2022, at approximately 3:20 p.m., J.S., a Black man, encountered Hudak while J.S. was driving on Concord Parkway South in Concord, North Carolina (NC).[1] Hudak was driving a black Dodge Ram covered in stickers and flags, including the Confederate flag (i.e., the SUBJECT VEHICLE 1). J.S. had heard stories about Hudak and how Hudak tried to run people off the road and yelled racial slurs at Black people. J.S. had also seen Hudak in his truck once before, and Hudak flipped J.S. off. For these reasons, J.S. felt startled and nervous when he encountered Hudak in traffic.

---

[1] Concord Parkway South is a facility provided and administered by North Carolina.

3

9.     Initially J.S. was driving behind Hudak. Traffic caused them to get close, and Hudak drove next to J.S.'s passenger side. J.S.'s windows were down a bit, and his sunroof was open. When J.S. looked to the right, Hudak was staring at him. As they drove next to each other, Hudak yelled "n****," "come here boy," and things about Trump. J.S. observed multiple knives, which looked like throwing knives, jammed into the driver's side window of Hudak's truck. Hudak tried to cut J.S. off, causing J.S. to swerve.

10.     J.S. drove away and noticed that Hudak was trying to keep up with J.S. At a stop light, J.S. was stopped in the far-left lane. Hudak, in turn, pulled his truck next to J.S.'s passenger side and then drove in front of J.S.'s car and into J.S.'s lane, blocking J.S.'s path. Hudak got out of his truck, approached J.S.'s car on foot, and pointed his finger saying, "Hey come here." J.S. rolled up his windows and closed his sunroof when J.S. saw Hudak exit his truck. Hudak banged on J.S.'s window and yelled racial slurs, including "come here n*****." J.S. felt threatened and reached for his pistol. After the light turned green and there was a break in traffic, J.S. swerved into the right lane and was able to drive away.

11.     Hudak then followed J.S. to his home, ██████████████████, a residential apartment complex in Concord, North Carolina. After the encounter with Hudak at the traffic light, J.S. called A.R. via cellular telephone and told her there was a man in a black pickup truck with Rebel flags on it following him, and J.S. felt threatened. J.S. asked A.R. to call the police and to bring him his assault rifle upon his arrival to the apartment complex.

12.     When J.S. arrived at the apartment complex, A.R. ran out into the parking lot in front of their apartment building to give J.S. his assault rifle. A.R. saw Hudak pull into the parking lot, followed by an unidentified man (UM) driving a black Cadillac SUV. Hudak and the black Cadillac SUV blocked the only entrance and exit to the parking lot during the exchange. A

4

screenshot from the surveillance footage from the [REDACTED] is included below; Hudak is the individual standing between the black Cadillac SUV and his truck, adorned with the Confederate flag:



13.    A.R. and J.S. both reported seeing Hudak with a gun.[2] Specifically, J.S. described seeing Hudak point a gun outside of his truck window and also that Hudak had the gun in his hand when he stopped outside of his truck during the encounter. Hudak shouted that he would shoot J.S. and the person in J.S.'s car. J.S. reported pointing his gun back at Hudak. A.R. reported that she saw Hudak point a gun out his window as he drove into the apartment complex parking lot. A.R. also described seeing a gun when Hudak got out of his truck and walked around his truck bed. A.R. said that Hudak pointed a gun at her again as he was leaving the apartment complex.

---

[2] J.S. called 911 during the encounter but did not contemporaneously report seeing a gun in Hudak's hand.

5

14. Throughout the encounter A.R. and J.S. reported that Hudak yelled slurs and threats, including statements like, "I will kill you n*****," and, "I will shoot that Black bitch. I know where you live, and I will be back."

15. Below is another screenshot from the surveillance footage from the ███████. After giving J.S. the firearm, A.R. got into J.S.'s white Dodge Charger and drove farther down the parking lot and parked facing the street (outside view of the below frame). J.S. retreated towards the apartment building on foot. J.S. is the individual in the orange sweatshirt shown below.



16. J.S. advised when Hudak pulled in, Hudak stopped for a moment, saw that J.S.'s car was moving, and began to pursue again until he saw J.S. J.S. thought Hudak was focused on who was driving the car and wanted to shoot A.R. J.S. was yelling at Hudak, telling him that J.S. had called the police and Hudak needed to leave.

6

17.    A.R. reported that when Hudak exited the parking lot, Hudak drove near where A.R. was parked and slowed down. Hudak's windows were down, and A.R. reported Hudak pointed a black handgun at A.R. A.R. got out of the car, ran back towards the apartment building, zig-zagging through parked cars, and took cover behind a parked truck. Hudak sped away, running a red light, as police sirens could be heard, according to J.S. and A.R.

18.    Concord Police Department (CPD) responded, with three officers responding to the ███████████ parking lot and three officers affecting a traffic stop of Hudak. Officers gave A.R. and J.S. Hudak's information, and A.R. and J.S. filled out a report at the Magistrate's Office the same day.

19.    At the scene of the traffic stop, body-worn camera ("BWC") footage from two different angles shows one officer performing a limited sweep of the driver's compartment of Hudak's vehicle. When another officer asked if the searching officer had found anything, the officer stated he had not, but "there's just so much stuff, I don't know." On the evening of October 13, 2022, CPD officers arrested Hudak for assault by pointing a gun and communicating threats based on the warrants J.S. had sworn out earlier in the day. Hudak was arrested, processed, and released on a written promise to appear in court.

20.    J.S. believed the incident with Hudak happened because J.S. was Black and drove a nice car. J.S. and A.R. both advised they had heard of Hudak prior to this incident. A.R.'s sister had seen Hudak's truck at a gas station in Concord, NC. Hudak was asked to leave because he was harassing people.

21.    I have reviewed the recorded 911 audio from the incident, as well as available surveillance camera footage captured from the ████████████████ and traffic camera footage captured from various intersections located on Concord Parkway South. Audio and

7

surveillance footage corroborates J.S. and A.R.'s account of the incident; however, the firearm was not visible on the surveillance, and CPD officers did not see it in while performing their limited sweep of Hudak's truck.

22.     Further, I conducted a review of CPD BWC footage captured during CPD's initial response to the incident, as well as during warrant service at the SUBJECT PREMISES on October 13, 2022. On the BWC, Hudak told CPD officers that Hudak was driving his daughter home from school and the engine of "the Black guy" backfired next to Hudak's truck, causing a loud noise which disturbed his daughter. Hudak said, "Alright, you ask for trouble, there is going to be trouble." Hudak reported that he cut J.S. off and walked around to the driver's side of J.S.'s vehicle. The driver rolled up his tinted window and Hudak said, "Come out, come out if you want to play," and punched the window twice on the driver's side door. Hudak reported he saw him (J.S.) go to the apartments, and he followed him to get pictures and video, which Hudak showed to CPD Officers on his two mobile devices. Hudak stated he did not point guns at J.S. or have any guns in his vehicle or residence. Hudak told CPD officers he was in possession of ammo, an air rifle, and knives at his residence, but he did not have any weapons in his vehicle because he had just been to his daughter's school.

<u>Subject Vehicle 2 Incident</u>

23.     On August 27, 2022, E.L. reported to Charlotte-Mecklenburg Police Department (CMPD) that a gray Honda was driving in front of him and slowed down. E.L. blew his horn at the gray Honda, and the driver of the gray Honda slammed on the brakes. E.L. avoided colliding with the gray Honda, blew his horn again, and moved into another lane. E.L. noticed the driver of the gray Honda attempting to follow E.L. as they switched lanes. The driver of the gray Honda drove beside E.L. and pointed a handgun out the window towards E.L. E.L. slowed down, moved

8

behind another vehicle, and documented the license plate of the gray Honda: NC tag: HET5079 (i.e. SUBJECT VEHICLE 2). E.L. described the driver of the gray Honda as a possible Hispanic male, over 40 years old, with a low haircut. The vehicle is registered to Hudak. CMPD and Concord Police Department (CPD) discussed the incident. CPD advised they are familiar with Hudak. CPD spoke with Hudak, and confirmed Hudak was driving the vehicle on the date of the incident. CMPD issued a warrant for Hudak for Assault by Pointing a Gun.

Hudak Law Enforcement Contact & Criminal History

24.    Hudak immigrated to the United States in 2001 and did not appear to have any law enforcement contact until 2017. Since March 2020, Hudak has had at least 17 instances of law enforcement contact which includes (but is not limited to)  Hudak communicating threats, broadcasting racial animus, allegedly attempting to run other drivers off the road, or engaging in weapons violations.

25.    Notably, in July 2022, multiple people called CPD to report that Hudak was broadcasting racial slurs over a loudspeaker on his truck in the Sam's Club parking lot. Below is a photograph taken of SUBJECT VEHICLE 1 during the incident.

9



26.     When officers arrived, Hudak was broadcasting "fuck the Black people" over a loudspeaker. A warrant was obtained for speech likely to provoke a riot and was served on Hudak on July 28, 2022. Hudak was banned from Sam's Club.

27.     Additionally, in March 2020, CPD reported to the FBI that during several law enforcement encounters, Hudak made statements that he hates Black people, that he wanted to buy a ticket to Syria to join his new friends, and that he had publicly burned the American flag and other items. Further, CPD reported to the FBI that Hudak has been encountered by law

10

enforcement wearing a TAC-vest, armed with several loaded weapons, knives, brass knuckles, and an ASP baton. Hudak would frequently get intoxicated and show erratic and aggressive behavior. Hudak was interviewed by the FBI Joint Terrorism Task Force in June 2020 and the incident was closed. During that interview Hudak advised he was very drunk on March 12, 2020, when he made the statement about going to Syria and fighting with his ISIS buddies, and he said something stupid due to excessive alcohol consumption. When asked about racial comments, Hudak advised he had trouble with some African American neighbors across the street. Hudak stated they did not agree with his political beliefs, and most likely did not like his Confederate flags and pro-Trump flags. Further, Hudak stated he does not hate Black people and actually rented a property to a wonderful Black couple.

28.     On December 30, 2022, Hudak was arrested for disorderly conduct after sitting at an intersection, yelling, "Fuck you, n****rs," at at least three Black pedestrians and drivers in downtown Concord, unprovoked. On the BWC footage, Hudak tells officers that he was yelling slurs because of the "Black guy" the day before who said he would "fuck [Hudak's] daughter's pussy" during a verbal altercation at a gas station, Hudak "started yelling at every intersection, 'You fucking n****rs.' So you know, if they don't have respect for me, I don't have respect for them... I can't take this anymore. I got banned from Sam's Club because they said that I yell F Black people, come on. Black people always insult me and my family..." Later in the same BWC video, Hudak tells officers, "Now at every intersection I will call, 'You F n****rs, F you,' and I show the fingers... It's my First Amendment, and I will use it because they ask for trouble."

29.     Based on my experience, I understand that those who display racial animus towards one particular minority group often demonstrate the same animus towards other, different minority groups. Based on my training and experience, I know that those motivated by animus to commit

11

acts of violence against others because of their race, color, and/or nationality commonly communicate in person or through electronic means such as e-mail or text message with like-minded individuals.

30.     Additionally, those motivated by animus may also maintain or collect records, including images and communication, which may indicate bias or mindset regarding race, color and/or nationality of individuals.

31.     On December 16, 2022, Cabarrus County conducted a probation search of the SUBJECT PREMISES and took photos of several items found during the search, including three Nazi flags, a KKK flag, three rings with the Iron Cross, and a French Foreign Legion medal and the U.S. Army Parachutist badge affixed to a black beret. The photos can be viewed below:

12



13



14



15



16



17



18



19

Incidents with Neighbors

32.     Hudak currently resides ███████ to a Mexican family, including A.D. and J.D. In
September 2022, A.D. obtained a Cabarrus County No Contact Order on Hudak, which is in effect
until September 2023. In the complaint filed by A.D., A.D. reported that on August 27, 2022,
Hudak came towards their dog with a bat and verbally attacked her daughters, ages nine and
thirteen, for letting the dog go into Hudak's yard. When A.D. came outside, Hudak continued to
yell and called A.D. a "fucking Mexican," "stupid, fat ass bitch," and said she should "go back to
Mexico." A.D. contacted the police because A.D.'s daughters were terrified. On August 29, 2022,
Hudak recorded A.D. while she was waiting for the bus, saying "there she is that stupid, fat ass
Mexican bitch," "her and her husband are stupid." A.D. took her daughter to a bus stop farther
away. On August 30, 2022, Hudak yelled at A.D. when A.D. was getting her trash cans, yelling,
"fucking fat ass Mexican bitch," "you like to pull guns," "I promise you this is never going to
end," and "you are a Mexican Gipsi [sic]." A.D. advised Hudak had assaulted A.D.'s son in
November 2021, A.D.'s family fear for their lives, and A.D.'s daughters do not feel safe.

33.     In an interview with J.D., A.D.'s son, J.D. advised that he ████████████████ █.
J.D. and his family had ████████████████████████████ █ Hudak moved in ████████
around April 2021. The first encounter J.D. had with Hudak occurred when J.D. was departing in
his truck, and Hudak flipped him off. When J.D. asked, "What is your problem?" Hudak said,
"Fuck you." As of January 2023, despite the No Contact Order, Hudak continues to flip off and
cuss at J.D., A.D., and the rest of A.D.'s family, including her ten-year-old daughter, who Hudak
called a "little bitch" in December 2022 and in open court on January 18, 2023.

34.     On November 26, 2021, J.D. parked his Camaro on the grass outside ████████
████████ because their driveway was full. J.D. reported his car headlights were not facing into

SUBJECT PREMISES. On the morning of November 27, 2021, when leaving for work, J.D. discovered his car had been egged. J.D. believed Hudak was responsible because the eggs were on the side of the car closest to SUBJECT PREMISES.

35. Around 11:00 p.m. that same evening, J.D. was departing ███████ to drop off his friend, L.L. Hudak came outside of his home yelling, saying that J.D.'s car was too loud, and his headlights pointed into Hudak's home, waking his daughter. Hudak said things like, "you fucking Mexican alcoholics" and "go back to your country." J.D. and Hudak argued back and forth, and J.D. said something like, if you want to do something, let's do it. J.D. did not leave his yard, and Hudak ran towards J.D.

36. Hudak swung at J.D., and J.D. avoided the first two or three swings. Hudak hit J.D. in the lip with a closed fist. J.D. returned punches, hitting Hudak in the gut, face and back of the head. Hudak fell and J.D. retrieved his shotgun from the trunk of his Camaro and pointed it at Hudak, telling Hudak that he needed to leave J.D.'s yard. Hudak was on all fours and tackled J.D. into the Camaro, causing vehicle damage. J.D. gave the gun to L.L., and Hudak and J.D. continued fighting. L.L. got close and tried to separate them, causing Hudak to hit L.L. When Hudak and J.D. got up, J.D. got the gun again and aimed at Hudak. They were walking around the car and Hudak continued to walk towards J.D. Hudak said things like, "fucking Mexican," "when I see you again, I am going to run you off the road," and "I'm going to kill you."

37. Hudak left and came back, and J.D. retrieved his handgun from the backseat of the Camaro. Hudak departed. ████████ were outside due to the commotion and advised they called the police. L.L. was interviewed by the FBI and the information L.L. provided corroborated the information J.D. provided.

38.     CPD responded to the incident and encouraged J.D. to file a report at the Magistrate's Office, which J.D. did. J.D. advised that he had subsequent contact with the Magistrate's Office regarding a settlement for the damage to his vehicle but had not heard anything since. When A.D. filed her complaint at the Magistrate's Office, she inquired about the status of J.D.'s case and was told that J.D. was not responsive to phone calls. As such, in October 2022, A.D. re-filed a report on J.D.'s behalf for the November 2021 incident.

39.     J.D. advised that prior to the incident in November 2021, J.D. was driving ████ and Hudak was driving toward J.D. in the opposite lane. Hudak got in front of J.D. in J.D.'s lane, causing J.D. to go off the road to avoid being hit. J.D. knew it was Hudak because of Hudak's truck, which J.D. described as a 1500 Dodge Ram with flags, including Confederate, USA, and police flags, as well as Trump stickers. J.D. reported Hudak also put peoples' names and addresses on his truck, including A.D. and J.D.'s other neighbors. In reference to A.D., Hudak's truck said, "illegals, drug abusers, alcoholics and racist." A photograph of Hudak's truck featuring names and addresses was provided by J.D.



40.     J.D. discussed the incident which occurred in August 2022 with A.D. and A.D.'s daughters. Because of the August 2022 incident, J.D. had decided to move home to watch over his sisters. J.D. moved home in September 2022, ███████████████████████████

██████████████████████████████████████████████████████

41.     Because of the current No Contact Order, Hudak has not been able to speak to J.D.'s family, though he has continued to flip them off. In the past, Hudak yelled "fucking beaner" when J.D.'s step-father arrived ████ and called A.D. things like, "fucking Mexican." J.D. thought Hudak would act the same way toward a different family if they were Hispanic or Black.

42.     Additionally, ███████ S.B. and J.B. filed a Cabarrus County No Contact Order on Hudak, which is in effect until September 2023. In the complaint filed by S.B., S.B. advised

23

Hudak put S.B. and her family in fear. Hudak listed S.B. and J.B. name and address on his truck, saying that they are cat killing murderers and drug dealers. Hudak yells profanity at S.B.'s family when they are outside. In the interview with J.D., J.D. advised that S.B.'s family was a nice family with multiple kids. S.B. and J.B. are not Black or Hispanic.

43. Based on my experience, I understand those motivated by animus to commit acts of violence against others because of their race, color, and/or nationality may collect items which reflect or display animus. Because Hudak frequently displayed items on this truck or in front of his residence which reflected his beliefs, and because such items were recovered from the SUBJECT PREMISES in December 2022 as described in paragraph 31, there is probable cause to believe Hudak may collect similar items inside of his residence. Additionally, I am aware that those motivated to commit acts of violence against others due to racial animus commonly communicate with or join associations or organizations with individuals who hold similar ideology.

Hudak's Electronic Devices

44. Review of BWC footage from several different arrests of Hudak revealed multiple occasions on which Hudak told law enforcement officers he had "evidence" of the activity of encounters with people which led to Hudak's arrest, including J.S. and A.D. During the CPD's initial response to the incident involving J.S, on October 13, 2022, Hudak showed a CPD officer a video and a photo Hudak took with his cell phone, which appeared to be a black Android, in the parking lot of J.S.'s apartment complex. That evening following his arrest, Hudak referenced two cell phones he had with "evidence" on them. On BWC footage captured on August 30, 2022, Hudak mentioned he had a body camera in his truck that he should start using. Additionally, on multiple occasions captured on BWC footage, Hudak described his home surveillance system,

24

which included cameras posted on the front of his house, or the presence of Hudak's surveillance system was visible. I have verified these cameras are visible from the street, and A.D. and other neighbors have described them during interviews. A.D. indicated at least one camera is pointed in the direction of their property. Furthermore, open source review of the Hudak's public Facebook profiles reveals Hudak frequently takes and posts photos of people and vehicles who he considers to be engaging in objectionable behavior.

45.     I know from my training and experience that individuals often carry cellular devices on their person.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

46.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES, identified in Attachment A-1, or on the PERSON TO BE SEARCHED, described in Attachment A-2, or in the SUBJECT VEHICLEs, described in Attachment A-3 and A-4, in whatever form they are found. One form in which the records are likely to be found is data stored on a mobile device (e.g., a phone or tablet). Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

47.     Based on the foregoing, there is probable cause to believe evidence of Hudak's encounters with people and vehicles, including his encounter with J.S., J.D., and other potential unidentified victims, will be found on Hudak's electronic devices, including cellular devices.

48.     I submit that there is probable cause to believe records will be stored on Hudak's cellular phone, computer, or storage medium, for at least the following reasons:

25

a. Hudak told and showed CPD officers on multiple occasions that he utilizes cellular devices to take pictures and videos, which Hudak considers "evidence," of his encounters those whose behavior he considers to be objectionable.

b. Hudak used his home surveillance system to monitor neighbors, including J.D. and A.D.

c. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

d. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

49. I submit that there is probable cause to believe those records will be stored on a mobile device. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage device, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted,

26

they can possibly be recovered months or years later using forensic tools, unless the file is overwritten by a newly saved file. This is so because when a person "deletes" a file on a computer, the data contained in the file is not deleted; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a mobile device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

50.     In my experience, when a user obtains a new mobile device, they are able to load the entire contents of the previous mobile device. The entire contents of the mobile device could include photo and video files, audio files, messaging, and internet browsing information.

51.     Mobile devices can also store electronic data such as call logs, which record dates and times of calls made to and from the device. Additional capabilities of mobile devices include, but are not limited to, the storage of names and telephone numbers, sending and receiving text messages, email messages, web browser history, taking and receiving still photographs and video files, storing and playback of audio files, storing electronic notes, dates, appointments and other information to other calendars, and accessing/downloading files from the internet, to include but not limited to, the uploading/downloading/viewing of files to cloud-based storage mechanisms, and acting as a remote wifi hotspot.

52.     I also know that during the search of a premises or person it is not always possible to search mobile devices for data for a number of reasons, including the following:

a. Searching mobile devices is a technical process that requires specific expertise and specialized equipment. If the device is locked and the password is unknown, the process is further complicated and may require specialized techniques.

27

b. The volume of data stored on mobile devices will typically be so large that it will be highly impractical to search for data during the execution of a physical search; and

c. Mobile device users can attempt to conceal data within unassuming or locked application. A substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

53. This application seeks permission to locate not only mobile device files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the mobile device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic evidence will reside on mobile devices presently located within the SUBJECT PREMISES and/or on the PERSON TO BE SEARCHED and/or within the SUBJECT VEHICLES described in Attachments A-2, A-3, and A4, and data on the storage medium can provide evidence of a file that once resided on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file.) Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

54. A computer forensics examiner, after examining this forensic evidence in its proper context, may be able to draw conclusions about how mobile devices were used, the purpose of their use, who used them, and when. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a team and passed

28

along to investigators. Whether data stored on a mobile device is evidence may depend on other information stored on the phone and the application of knowledge about how a mobile device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a mobile device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

55.     As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a mobile device has been used, what it has been used for, and who has used it requires considerable time. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Modern storage media can store large volumes of information. Reviewing that information for items described in the warrant can take weeks or months, depending on the volume of data stored.

56.     The search warrant further requests authorization to use the biometric unlock features of a device (including phones and computers) if necessary, based on the following, which I know from my training, experience, and review of publicly available materials:

57.     Users may enable a biometric unlock function on some digital devices (including phones and computers). To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for

29

approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

58. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

59. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor, falls within the scope of the warrant, and is attributable to a specific person:[3] (1) depress that individual's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of that individual's face with his/her eyes open to activate the facial, iris-, and/or retina-recognition feature.

60. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination will require special techniques, including but not limited to, specialized computer hardware and software utilized to search for and extract items of investigative interest.

---

[3] This warrant does not seek permission to attempt to use the biometric features to unlock a mobile device on multiple individuals, only if any of the individuals specified in Attachment A-2 can be attributed to a specific mobile device at the time of the search.

## CONCLUSION

61.    Based on the forgoing, I respectively submit that there is probable cause to search the SUBJECT PREMISES, as described in Attachment A-1, the PERSON TO BE SEARCHED, as described in Attachment A-2, the SUBJECT VEHICLE 1, as described in Attachment A-3, the SUBJECT VEHICLE 2, as described in Attachment A-4 for the items and records described in Attachment B.

Respectfully submitted,
/s/ Michael Stone
Michael Stone
Special Agent
Federal Bureau of Investigation

On this day, the applicant appeared before me by reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1. June 20, 2023  3:28 pm.

The Hon. Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

31

*Property to Be Searched*

The property to be searched is SUBJECT VEHICLE 1, a black Dodge Ram with North Carolina license plate PAF8003, owned by Marian Hudak. Below is a photo of the SUBJECT VEHICLE 1:



## ATTACHMENT B

*Items to be Seized*

All information described above in Attachments A-1, A-2, A-3, and A-4 that constitute evidence and instrumentalities of violations of Title 18, United States Code, Section 245 (interference with federally protected activities); and Title 42, United States Code, 3631 (interference with housing rights), in the following form:

I.    **For mobile devices, to include computers, cellular telephones, and electronic devices capable of communicating via the internet as well as any form of storage medium potentially capable of containing photographs, videos, documents, or materials:**

    a.   Records revealing the identity of the person(s) with access to the mobile device seized;

    b.   Evidence, including communications, referencing incidents involving J.D. and/or A.D. that took place in November 2021, August 2022, and any dates not identified;

    c.   Evidence, including communications, referencing the incident involving J.S. and A.R. that took place on October 13, 2022;

    d.   Evidence referencing bias or animus towards J.S., A.R., J.D., A.D., and other potential victims;

    e.   Records or communications referencing preparatory steps taken in furtherance of Hudak's interactions with A.R. and J.S; and

    f.   Records or communications referencing preparatory steps taken in furtherance of Hudak's interactions with J.D., A.D., and/or individuals associated with their residence.

**The following items may be searched for the above-referenced evidence:**

  a. Contents of the electronic directory;

  b. Communications in the form of texts, messages, photographs, images, electronic mail, and any other form of electronic communication;

  c. Stored communications, including voicemail, voice messages, or other memory features;

  d. Texts, photographs, videos audio files, and/or images;

  e. Phone call logs;

  f. Stored communications to include voicemail, or any other memory feature;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**Biometric Permissions**

During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor) of the individual associated with the mobile device, and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the individual associated with the mobile device with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

Further, this warrant does not authorize law enforcement personnel to compel that any individual state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

II.    **Other Items of Evidence**

1. Evidence demonstrating the Hudak's animus towards individuals associated with and/or individuals perceived to be associated with racial minority groups;

2. Firearms to include firearm parts, firearm paraphernalia, ammunition; and

3. Any and all records, documents, invoices, notes and materials that pertain to the ownership and/or possession of firearms.